UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LAMON LAMAR BARNES,

                        Plaintiff,

          v.                                        Case No. 13-cv-607-pp

BROWN COUNTY,
BROWN COUNTY DRUG TASK FORCE,
DAVE POTEAT, JEFF LADE,
ZAK HOSCHBACH, MARK HACKETT,
JOHN LAUX, GUY SHEPARDSON,
INVESTIGATOR DERNBACH,
VILLAGE OF ASHWAUBENON,
CITY OF GREEN BAY, JUJUAN JONES,
DTF INVESTIGATOR SCANLAN,
MARY LYNN YOUNG, and BRAD BRODBECK,

                        Defendants.

**DECISION AND ORDER GRANTING BROWN COUNTY DEFENDANTS'
AMENDED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 226),
GRANTING CITY OF GREEN BAY DEFENDANTS' RENEWED MOTION FOR
SUMMARY JUDGMENT (DKT. NO. 235), GRANTING VILLAGE OF
ASHWAUBENON DEFENDANTS' AMENDED MOTION FOR SUMMARY
JUDGMENT (DKT. NO. 233/226), DISMISSING DEFENDANT JUJUAN
JONES, AND DISMISSING CASE**

The plaintiff, Lamon Lamar Barnes, is a Wisconsin state prisoner

representing himself. His lawsuit alleges that the defendants violated his rights

under the United States Constitution and Wisconsin state law related to a

criminal investigation conducted by a drug task force in Brown County, which

resulted in his arrest and subsequent conviction on six counts of delivering

cocaine. Dkt. No. 35. The defendants have moved for summary judgment. Dkt.

1

Case 2:13-cv-00607-PP   Filed 03/13/17   Page 1 of 48   Document 259

No. 226, 235, 233. For the reasons explained in this order, the court grants the defendants' motions and dismisses this case.

## I.    BACKGROUND

### A.    The Complaints

The plaintiff filed his original complaint on May 30, 2013. Dkt. No. 1. He named eleven defendants: Brown County, the Brown County Drug Task Force (DTF), Dave Poteat, John Laux, Mark Hackett, Brad Dernbach, Zak Hoschbach, Jeff Lade, Guy Shepardson, Jujuan Jones and Anthony Washington. Id. at 5-6. Two weeks later, he filed his first amended complaint. Dkt. No. 7. This complaint named the same eleven defendants, plus five John and Jane Doe defendants. Id. at 1. Several months later, on January 10, 2014, he filed a second amended complaint. Dkt. No. 21. This one named ten of the original defendants—this time, the plaintiff left out Anthony Washington—along with the five Doe defendants, but added the Village of Ashwaubenon and the City of Green Bay. Id. at 6.

On March 5, 2014, the plaintiff filed a motion, asking leave to file a third amended complaint. Dkt. No. 34. Seven weeks later, Judge Rudolph T. Randa issued a screening order. Dkt. No. 35. In that order, he granted the plaintiff's motion to file a third amended complaint, and ruled that that complaint would be the operative complaint going forward. Id. at 10. The third amended complaint did not add, or delete, any defendants.

While Judge Randa indicated that it appeared that the plaintiff's claims might be barred by the Supreme Court's decision in Heck v. Humphrey, 512

U.S. 477 (1994), he nonetheless allowed the plaintiff to proceed on claims challenging aspects of the criminal investigation that led up to the plaintiff's January 11, 2011, arrest for delivering cocaine. Dkt. No. 35 at 5-6. The screening order summarized the plaintiff's four claims: First, the plaintiff alleged that the defendants "with[e]ld exculpatory evidence contained in unofficial files" in drug trafficking cases that involved a confidential informant, which harmed the plaintiff by depriving him of his right to a fair trial. Id. at 4. Second, the plaintiff alleged that Drug Task Force officials "fabricat[ed] evidence that was not essential to my conviction, but done in effort to establish probable cause and also separately obtain a conviction[.]" Id. Third, the plaintiff alleged that Brown County, the Drug Task Force, and participating municipalities "utilized an unconstitutional custom, policy, and/or practice for receiving and resolving complaints made by citizens about the misconduct of DTF investigators which did not allow citizens to take good faith participation in any complaint procedure[.]" Id. at 4-5. Fourth, the plaintiff alleged that Brown County, the Drug Task Force, and participating municipalities utilized an unconstitutional custom, policy, and/or practice to not strip search confidential informants "which denied DTF suspects of corroboration specifically in situations when indications were present a CI is unreliable/compromised and entered or exited a controlled transaction with manufactured evidence." Id. at 5.

On June 16, 2015, the plaintiff asked for leave to file a fourth amended complaint. Dkt. No. 182. Judge Randa granted that motion, dkt. no. 183, and

3

on June 19, 2015, the clerk's office docketed the fourth amended complaint. Dkt. No. 184. This complaint identified three of the Doe defendants as Investigator Scanlan, Investigator Bradbeck[1], and Mary Lynn Young. Id. at 1. The fourth amended complaint now is the operative complaint.

All but one of the defendants named in the fourth amended complaint have counsel; they have divided into three groups, each represented by different attorneys. Defendants Brown County, the Brown County DTF, Dave Poteat, Zak Hoschbach, Mark Hackett, Guy Shepardson, Investigator Dernbach, Mary Lynn Young, and Brad Brodbeck are one group, whom the court will refer to as "the Brown County defendants." Jeff Lade and the Village of Ashwaubenon are the second group; the court refers to them as "the Ashwaubenon defendants." John Laux, the City of Green Bay, and DTF Investigator Scanlan are the third group—"the Green Bay defendants."

The plaintiff also named Jujuan Jones as a defendant. Jones has not answered the complaint, or participated in this litigation.

B.    Summary Judgment Motions

On December 8, 2014, all of the represented defendants filed a joint motion for summary judgment, dkt. nos. 123-134, supported by a joint brief, dkt. no 124. The Brown County defendants filed separate proposed findings of fact, dkt. no. 125, as did the Green Bay defendants, dkt. no. 129.

---

[1] The plaintiff identified someone named "Bradbeck" as one of the Doe defendants; the answer to the fourth amended complaint indicates that the defendant's actual name is Brad Brodbeck. Dkt. No. 201.

4

On July 7, 2015, following the plaintiff's filing of the fourth amended complaint and identifying the Doe defendants, Judge Randa denied without prejudice the defendants' joint motion for summary judgment. Dkt No. 207. The court noted that once the newly-identified defendants had been served and had answered the complaint, it would enter a scheduling order allowing the plaintiff to conduct limited discovery relating to the new defendants. Id. at 4. The court advised the defendants that when they filed an amended motion for summary judgment, they could refer to materials from their original motion, without refiling the materials with the court. Id. at 3. The Brown County defendants (including Brodbeck and Young) answered the fourth amended complaint on July 2, 2015, dkt. no. 201; the Green Bay defendants (including Scanlan) answered on July 15, 2015, dkt. no. 211, and the Ashwaubenon defendants answered on July 23, dkt. no. 215. Judge Randa then set the new deadline for filing dispositive motions for April 15, 2016. Dkt. No. 218 at 20.

On April 14, 2016, the Brown County defendants filed a supplemental motion for summary judgment, along with a supporting brief and supplemental proposed findings of fact. Dkt. No. 226-232. That same day, the Ashwaubenon defendants filed a letter, stating that they joined the Brown County defendants' summary judgment motion and materials. Dkt. No. 233. On April 15, 2016, the Green Bay defendants filed a renewed motion for summary judgment, along with amended proposed findings of fact. Dkt. No. 235-238. They did not file a new brief.

The plaintiff responded to the defendants' summary judgment motion on May 26, 2016. Dkt. No. 244-248. Although the plaintiff responded to the defendants' proposed findings of fact and filed an affidavit, dkt. no. 245-247, he did not file his own proposed findings of fact. See Civil L.R. 56(b)(2)(B)(ii) (E.D. Wis.) (requiring a party opposing a motion for summary judgment to file, among other things, a response to the moving party's statement of facts by numbered paragraph, and a statement of any additional facts upon which the opposing party relies).

On June 15, 2016, the Brown County defendants filed a reply in support of their summary judgment motion. Dkt. No. 250.

On August 4, 2016, this case was reassigned to this court.

## II. FACTS[2]

Brown County Drug Task Force (DTF) officials arrested the plaintiff on January 11, 2011, and charged him with six counts of delivering cocaine as part of DTF investigation number 10-0269. Dkt. No. 125 at ¶¶1-2. DTF investigation 10-0269 used a confidential informant ("CI") named Jujuan Jones. Id. at ¶3. The DTF Investigation 10-0269 file materials refer to Jones as "CI 1395." Id. at ¶4. A jury found the plaintiff guilty of all six charges that

---

[2] The court takes the facts from the Brown County defendants' Proposed Findings of Fact and Supplemental Proposed Findings of Fact (Dkt. No. 125, 228), and the Green Bay defendants' Proposed Findings of Fact and Amended Proposed Findings of Fact (Dkt. No. 129, 236). The plaintiff filed responses to the defendants' proposed facts, some of which purport to dispute certain facts. Dkt. No. 245, 246. The court includes the plaintiff's responses in this section only to the extent that his response addresses and/or disputes the proposed fact.

resulted from DTF investigation 10-0269. Id. at ¶5; State v. Barnes, Case No.

2011CF000043, Brown County Circuit Court, at https://wcca.wicourts.gov.

A.    September 17, 2010, Transaction

The first undercover activity in DTF investigation 10-0269 took place on

September 17, 2010. Dkt. No. 125 at ¶7. That day, two DTF officers, including

defendant Mark Hackett, met with CI 1395 to arrange a controlled purchase of

cocaine base ("crack") between CI 1395 and a man known as Tone.[3] Id. at ¶8.

The DTF officers fitted CI 1395 with a digital wireless transmitter/recorder and

an audiovisual recorder, and gave him $275 of prerecorded U.S. currency. Id.

at ¶9. The DTF officers provided CI 1395 with an undercover DTF vehicle to use

during the controlled buy transaction. Id. at ¶10. As required by DTF policy 06

pertaining to the undercover use of informants, the DTF officers searched CI

---

[3] The plaintiff takes issue with the fact that the "Operational Plan" for the
September 17, 2010 controlled purchase indicates that Investigator Ronk did
not participate, while the "Case Activity Report" states that Ronk did
participate. Dkt. No. 246 at ¶8. The proposed fact at ¶8 of Dkt. No. 125,
however, does not relate to Investigator Ronk. The defendants also explain that
one difference between Operation Plans and Case Activity Reports is that while
the former are proposals for future activity, the latter are accounts of the
activity that actually occurred. Dkt. No. 250 at 11. There are rational
explanations for discrepancies between an Operational Plan and a Case Activity
Report. Id. DTF investigators may call in sick, switch shifts, or take vacation
and therefore may not be available on the date of the actual operation. Id. at
12. As intelligence is gathered and even as a transaction is in process,
strategies may be altered to address changed circumstances or objectives. Id.;
see also Dkt. No. 197 (Poteat Declaration identifying these possibilities and
explaining how they affect various documents).
    The plaintiff objects to several proposed facts based on a discrepancy
between the Operational Plan and the Case Activity Report. As explained, these
discrepancies do not equate to factual dispute over what actually occurred. The
court will not treat the plaintiff's objections on that basis as a factual dispute.

7

1395 and the undercover DTF vehicle for contraband or currency, with negative results.[4] Id. at ¶11.

On September 17, 2010, CI 1395 drove to a gas station, where he and Tone had agreed to meet. Id. at ¶12. CI 1395 approached Tone while Tone was in a black Toyota Camry. Id. at ¶13. After waiting a few minutes at the gas station, a blue Hummer, driven by a heavy-set, unidentified man, pulled into the gas station. Id. at ¶14. CI 1395 gave Tone $275. Id. at ¶15. After receiving $275 from CI 1395, Tone left the Camry and got into the front passenger seat of the Hummer. Id. at ¶16. The vehicle drove away, and was gone for less than a minute before pulling back into the gas station. Id. at ¶17. Tone exited the Hummer, got back into his vehicle, and handed CI 1395 two bags of crack. Id. at ¶¶18-19. CI 1395 then got back into the undercover DTF vehicle and returned to the DTF officers. Id. at ¶20.

Upon meeting back up with DTF officers, CI 1395 returned the recording equipment, vehicle and the purchased crack. Id. at ¶21. DTF officers performed a field test on the crack to confirm the weight and the presence of cocaine base. Id. at ¶22. DTF officers itemized all of the expended prerecorded money by serial number as required by DTF policy 06 pertaining to the purchase of

---

[4] The plaintiff "disputes" this fact as to the nature of the search conducted, and clarifies that the DTF does not strip search confidential informants. Dkt. No. 246 at ¶11. The plaintiff cites to Hackett's trial testimony that his agency does not strip search confidential informants because, if the did, it would be difficult to get confidential informants. Dkt. No. 92-21. Throughout the defendants' proposed facts, every time an officer searches a confidential informant, the plaintiff objects that the search was not a strip search. Because the plaintiff's assertion is not a dispute (the defendants agreed that they didn't strip search informants), the court will not note every instance of that assertion in its recitation of the facts.

8

evidence. Id. at ¶23. They placed the crack, all recorded audio and visual material, and all other evidence collected during the controlled transaction into labeled evidence bags as required by DTF policy 09. Id. at ¶24. As required by DTF policy 06 pertaining to the undercover use of informants, DTF officers searched CI 1395 and the DTF vehicle for any currency or contraband with negative results. Id. at ¶25.

Officer Hackett transported all evidence collected during the controlled transaction directly to the DTF, where it was weighed and processed. Id. at ¶26. Officer Hackett packaged and sealed the evidence. Id. at ¶27. He completely and accurately entered the items of evidence into "Evidence Manager." Id. at ¶28. Officer Hackett printed bar code labels from Evidence Manager, and affixed them to the outside of each package of evidence collected during the controlled transaction. Id. at ¶29. He placed each sealed and labelled item of evidence collected during the controlled transaction into an evidence locker. Id. at ¶30.

On September 17, 2010, CI 1395 told DTF officers that he was not able to ascertain the identity of the man driving the blue Hummer. Id. at ¶31. That day, a surveillance unit that included Lieutenant John Laux followed the blue Hummer, and observed the driver exiting the vehicle at an apartment complex. Id. at ¶32. Lieutenant Laux observed that the driver of the blue Hummer was a heavier-set black man. Id. at ¶33. Officer Hackett researched the license plates law enforcement had observed on the blue Hummer involved in the controlled transaction, in an attempt to determine the identity of the driver. Id. at ¶34.

9

The blue Hummer was registered to a woman living in Milwaukee. Id. at ¶35. On September 17, 2010, Officer Hackett discovered that the woman to whom the blue Hummer was registered had a son named Lamon Barnes. Id. at ¶36. Officer Hackett obtained an undated photograph of Lamon Barnes and showed it to Lieutenant Laux. Id. at ¶37. Lieutenant Laux confirmed that the person in the photograph was the same person he observed driving the blue Hummer involved in the controlled transaction. Id. at ¶38.

B.    October 5, 2010, Transaction

On October 5, 2010, CI 1395 met with DTF officers Mark Hackett and Guy Shepardson to prepare for a second controlled purchase of crack from Tone. Id. at ¶39. At their meeting, CI 1395 told DTF officers that Tone was going to obtain the crack from a man known as Blue. Id. at ¶40. That day, CI 1395 called Tone, and they eventually agreed to meet at Tone's house, where they could wait for their supplier to arrive with the crack. Id. at ¶41. DTF officers fitted CI 1395 with a digital wireless transmitter/recorder and an audiovisual recorder, and gave CI 1395 $450 in prerecorded U.S. currency. Id. at ¶42. The DTF officers searched CI 1395 for U.S. currency and contraband, with negative results. Id. at ¶43.

CI 1395 went to Tone's house, where they waited for Blue. Id. at ¶44. While at Tone's house, Tone told CI 1395 that he had just received a text from a different crack dealer, a man known as Fatz, and that Fatz would be bringing the crack over shortly. Id. at ¶45. Tone told CI 1395 that Fatz was the other

10

man in the Hummer that had accompanied him during the September 17, 2010, transaction. Id. at ¶46.

CI 1395 checked back in with Officers Hackett and Shepardson under the guise of confirming whether his ride would stay a little longer. Id. at ¶47. CI 1395 returned the recording equipment and currency to DTF officers and was searched for any currency or contraband with negative results. Id. at ¶48. CI 1395 called Tone and Tone assured him that Fatz was still on his way. Id. at ¶49. DTF officers fitted CI 1395 again with the digital wireless transmitter/recorder and an audiovisual recorder, and gave him the $450 in prerecorded U.S. currency. Id. at ¶50.

CI 1395 returned to Tone's house and gave Tone money for the crack. Id. at ¶51. While CI 1395 stayed inside, Tone went outside to get the crack from Fatz. Id. at ¶52. After going outside to meet Fatz, Tone came back inside his house and gave the crack to CI 1395. Id. at ¶53. CI 1395 departed Tone's residence, and met back up with DTF Officers Hackett and Shepardson immediately. Id. at ¶54.

CI 1395 returned the recording equipment to DTF officers. Id. at ¶55. DTF officers searched CI 1395 for any currency or contraband, with negative results. Id. at ¶56. DTF officers performed a field test on the crack purchased by CI 1395 to confirm its weight and the presence of cocaine base. Id. at ¶57. DTF officers itemized all of the expended prerecorded money by serial number. Id. at ¶58. They placed the crack, all recorded audio and visual material, and

11

all other evidence collected during the controlled transaction, into labeled evidence bags. Id. at ¶59.

When DTF officers tested and weighed the crack, the bag appeared to weigh less than it was supposed to. Id. at ¶60. Upon learning that he had not received as much crack as he was told he was getting, CI 1395 called Fatz directly. Id. at ¶61. CI 1395 told Fatz that he was the guy who just bought the crack with Tone, and told him the amount was short. Id. at ¶62. CI 1395 asked if he could just deal directly with Fatz for future drug purchases. Id. at ¶63. Fatz told CI 1395 that if the amount of crack was short, that was between CI 1395 and Tone. Id. at ¶64. Fatz told CI 1395 that they could deal with each other directly for future drug purchases. Id. at ¶65.

On October 5, 2010, Officer Hackett transported all evidence directly to the DTF where it was weighed and processed. Id. at ¶66. Officer Hackett packaged and sealed the evidence. Id. at ¶67. He completely and accurately entered the items of evidence collected during the controlled transaction into Evidence Manager. Id. at ¶68. Officer Hackett printed bar code labels from Evidence Manager, and affixed them to the outside of each package of evidence. Id. at ¶69. He placed each item of evidence collected into an evidence locker. Id. at ¶70.

C. October 20, 2010, Transaction

On October 20, 2010, DTF Officers Hackett and Shepardson met with CI 1395 to set up a controlled transaction. Id. at ¶71. CI 1395 would purchase the crack directly from Fatz. Id. at ¶72. By October 20, 2010, the DTF had

positively identified Fatz as the plaintiff, Lamon Barnes. Id. at ¶73. That day, CI 1395 called the plaintiff and arranged to meet at Wal-Mart. Id. at ¶74. Officers Hackett and Shepardson fitted CI 1395 with a digital wireless transmitter/recorder and an audiovisual recorder and gave him $450 of prerecorded U.S. currency. Id. at ¶75. DTF officers searched CI 1395 and his vehicle for any currency or contraband, with negative results. Id. at ¶76.

A surveillance unit of DTF officers located near plaintiff's residence observed the plaintiff getting into a blue Hummer. Id. at ¶77. The surveillance unit of DTF officers followed the plaintiff as he drove the blue Hummer to Wal-Mart, then observed him get out and walk into the store. Id. at ¶78. Approximately two minutes after the plaintiff walked into Wal-Mart, CI 1395 arrived at Wal-Mart and began walking toward the store. Id. at ¶79. As he was walking toward the entrance to Wal-Mart, CI 1395 called the plaintiff, and the plaintiff asked that CI 1395 meet him inside the store. Id. at ¶80. As CI 1395 entered the Wal-Mart store, two DTF officers, including Zak Holschbach, also entered the store and kept visual contact on CI 1395 and the plaintiff. Id. at ¶81. CI 1395 met the plaintiff inside the Wal-Mart store, and they walked through the laundry detergent aisle while the plaintiff talked on his cell phone. Id. at ¶82. CI 1395 and the plaintiff exited the Wal-Mart store together and got into the blue Hummer. Id. at ¶¶83-84. CI 1395 gave the plaintiff $300 of prerecorded U.S. currency, and the plaintiff then gave CI 1395 a bag of crack. Id. at ¶85. The plaintiff told CI 1395 that he only had $300 worth of crack to sell. Id. at ¶86. The plaintiff discussed the October 7th controlled transaction

13

with CI 1395, and told CI 1395 that Tone messed with the bag of crack and that was why the weight was off. Id. at ¶87. About a minute after receiving the crack from the plaintiff, CI 1395 got out of the Hummer in the Wal-Mart parking lot and walked back to his car as the plaintiff drove away. Id. at ¶88.

CI 1395 immediately met with DTF officers, and returned the recording equipment and unused currency. Id. at ¶89. CI 1395 gave DTF officers the purchased crack. Id. at ¶90. DTF officers searched CI 1395 and his vehicle for any currency or contraband, with negative results. Id. at ¶91. DTF officers performed a field test on the crack to confirm its weight and the presence of cocaine base. Id. at ¶92. They itemized all of the expended and unexpended prerecorded money by serial number. Id. at ¶93. DTF officers placed the crack, all recorded audio and visual material, and all other evidence collected during the controlled transaction into labeled evidence bags. Id. at ¶94.

Officer Hackett transported all evidence collected during the controlled transaction directly to the DTF where it was weighed and processed. Id. at ¶95. Officer Hackett packaged and sealed the evidence collected during the controlled transaction. Id. at ¶96. He completely and accurately entered the evidence into Evidence Manager. Id. at ¶97. Officer Hackett printed bar code labels from Evidence Manager, and affixed them to the outside of each package of evidence. Id. at ¶98. He placed each item of evidence collected in the controlled transaction into an evidence locker. Id. at ¶99.

D.    <u>October 29, 2010, Transaction</u>

On October 29, 2010, DTF Officers Hackett and Holschbach met with CI
1395 to prepare for another controlled transaction buy of crack from the
plaintiff. <u>Id.</u> at ¶100. The plaintiff called CI 1395 and agreed to meet at a gas
station. <u>Id.</u> at ¶101. DTF officers fitted CI 1395 with a digital wireless
transmitter/recorder and an audiovisual recorder, and gave him $600 of
prerecorded currency. <u>Id.</u> at ¶102. DTF officers searched CI 1395 and his
vehicle for contraband or currency, with negative results. <u>Id.</u> at ¶103. A
surveillance unit of DTF officers, including Brad Dernbach, was located near
the plaintiff's residence, and observed the blue Hummer and a white Cadillac
parked in the parking lot. <u>Id.</u> at ¶104. The surveillance unit observed the
plaintiff leave the building with a woman, and watched as the pair drove away
in the white Cadillac. <u>Id.</u> at ¶105. The surveillance unit followed the plaintiff as
he drove to a set of storage units and met with an unidentified man, then as he
went to the gas station to meet CI 1395. <u>Id.</u> at ¶106.

CI 1395 got into the back seat of the Cadillac when it arrived at the gas
station. <u>Id.</u> at ¶107. The plaintiff drove the white Cadillac around to the back of
the gas station and parked against an apartment complex garage. <u>Id.</u> at ¶108.
CI 1395 gave prerecorded U.S. currency to the plaintiff, who gave CI 1395 a
bag of crack. <u>Id.</u> at ¶109. The plaintiff dropped CI 1395 off at his vehicle, and
CI 1395 met back up with Officers Hackett and Holschbach. <u>Id.</u> at ¶110.

CI 1395 returned the recording equipment to DTF officers and gave DTF
officers the purchased crack. <u>Id.</u> at ¶111. DTF officers searched CI 1395 and

15

his vehicle for contraband or currency, with negative results. Id. at ¶112. DTF officers performed a field test on the crack to confirm its weight and the presence of cocaine base. Id. at ¶113. DTF officers itemized all of the expended prerecorded money by serial number. Id. at ¶114. The officers placed the crack, all recorded audio and visual material, and all other evidence collected during the controlled transaction into labeled evidence bags. Id. at ¶115. Officer Hackett transported all evidence collected during the controlled transaction directly to the DTF where it was weighed and processed. Id. at ¶116. He packaged and sealed the evidence collected during the controlled transaction. Id. at ¶117. Officer Hackett completely and accurately entered the items collected during the controlled transaction into Evidence Manager. Id. at ¶118. He printed bar code labels from Evidence Manager, and affixed them to the outside of each package of evidence collected during the controlled transaction. Id. at ¶119. Officer Hackett placed each item of evidence collected during the controlled transaction into an evidence locker. Id. at ¶120.

E.    December 3, 2010, Transaction

On December 3, 2010, DTF Officers Hackett and Shepardson met with CI 1395 to set up a controlled transaction of crack from the plaintiff. Id. at ¶121. CI 1395 called the plaintiff and they agreed to meet at a Subway restaurant. Id. at ¶122. DTF officers fitted CI 1395 with a digital wireless transmitter/recorder and an audiovisual recorder, and gave him $600 of prerecorded currency. Id. at ¶123. DTF officers provided CI 1395 with an undercover DTF vehicle for use during the controlled transaction. Id. at ¶124.

16

DTF officers searched CI 1395 and the undercover DTF vehicle for contraband or currency, with negative results. Id. at ¶125.

After waiting in the Subway parking lot for about thirty minutes, CI 1395 received a call from the plaintiff, telling him to drive further west. Id. at ¶126. CI 1395 drove to the area that the plaintiff had described, and parked in a hardware store parking lot. Id. at ¶127. CI 1395 called the plaintiff and gave him his location. Id. at ¶128. Fifteen minutes later, the plaintiff pulled into the hardware store parking lot in the blue Hummer. Id. at ¶129. CI 1395 got out of his car, and got into the front seat of the Hummer in the hardware store parking lot. Id. at ¶130. CI 1395 and the plaintiff drove around in the blue Hummer, at which time CI 1395 gave the plaintiff $600 in prerecorded currency, and the plaintiff gave CI 1395 three bags of crack. Id. at ¶131. After selling CI 1395 the crack, the plaintiff dropped CI 1395 off at the undercover DTF vehicle and drove away. Id. at ¶132.

After purchasing crack from the plaintiff, CI 1395 met back up with Officers Hackett and Shepardson at a prearranged location. Id. at ¶133. CI 1395 returned the recording equipment and the undercover DTF vehicle and gave the officers the purchased crack. Id. at ¶134. DTF officers searched CI 1395 and the vehicle for contraband or currency, with negative results. Id. at ¶135. DTF officers itemized all of the expended prerecorded money by serial number. Id. at ¶136. Officer Hackett transported all evidence collected during the controlled transaction directly to the DTF where it was weighed and processed. Id. at ¶137. Officer Hackett packaged and sealed the evidence. Id. at

17

¶138. He completely and accurately entered the items collected during the controlled transaction into Evidence Manager.[5] Id. at ¶139. Officer Hackett printed bar code labels from Evidence Manager and affixed them to the outside of each package of evidence collected during the controlled transaction. Id. at ¶140. He placed each item of evidence collected during the controlled transaction into an evidence locker. Id. at ¶141.

     F.    <u>January 11, 2011, Transaction</u>

On January 11, 2011, Officers Hackett and Shepardson met with CI 1395 to arrange a controlled transaction of crack from the plaintiff. Id. at ¶142. CI 1395 had contacted the plaintiff on January 11, 2011, before CI 1395 met with DTF officers, and the plaintiff told CI 1395 that he would deliver the crack to CI 1395. Id. at ¶143. Upon speaking to the plaintiff again while preparing with the DTF officers, CI 1395 agreed to meet the plaintiff at a nearby grocery store. Id. at ¶144. DTF officers fitted CI 1395 with a digital wireless transmitter/recorder and an audiovisual recorder, and gave him $600 of prerecorded currency. Id. at ¶145. DTF officers provided CI 1395 with an undercover DTF vehicle. Id. at ¶146. DTF officers searched CI 1395 and the

---

[5] The plaintiff "disputes" this fact, and states that "the Operational Plan dated October 29, 2010, for DTF Case 10-269-004 is DTF case 10-269-004 as DTF Operational Plan dated October 21, 2010 lists a case number 10-269-004." Dkt. No. 246 at ¶139. The defendants point out that while a draft Operational Plan dated October 21, 2010, exists, a controlled transaction did not take place on that date. Dtk. No. 250 at 14. If a planned controlled buy does not go forward, the next Operational Plan draft for the investigation is assigned the same case sub-number, so that all of an investigation's completed buys are numbered sequentially when they are referred to the District Attorney. Dkt. No. 197 at ¶10; Dkt. No. 196 at 5-10, 27; Dkt. No. 218 at 5. The plaintiff insists that a transaction occurred on October 21, 2010; he has not, however, supported that statement with admissible evidence.

vehicle for contraband or currency and found currency on CI 1395's person. Id. at ¶147. Officer Hackett confiscated CI 1395's currency and kept it in his possession until the controlled transaction was completed. Id. at ¶148. (Confidential informants are not permitted to have on their person any U.S. currency during controlled transactions other than the prerecorded U.S. currency provided by the DTF. Id. at ¶149.)

CI 1395 then drove to the grocery store parking lot to meet the plaintiff. Id. at ¶150. After CI 1395 had waited for approximately seventeen minutes, the plaintiff called CI 1395, and CI 1395 confirmed the meeting location. Id. at ¶151. Approximately twenty-one minutes after the plaintiff called CI 1395, a DTF surveillance unit including John Laux observed the blue Hummer driving to the area where CI 1395 was waiting. Id. at ¶152. At the same time that the DTF surveillance unit observed the blue Hummer, the plaintiff called CI 1395 and told him to meet at a Pizza Hut parking lot down the street. Id. at ¶153. CI 1395 drove from the grocery store to the Pizza Hut, got out of the DTF vehicle, and entered the front seat of the blue Hummer driven by the plaintiff. Id. at ¶154. CI 1395 gave plaintiff the $600 of prerecorded currency and the plaintiff gave CI 1395 three bags of crack. Id. at ¶155. CI 1395 got out of the Hummer, got back into the undercover DTF vehicle, and met back up with DTF officers at a prearranged location. Id. at ¶156.

CI 1395 returned the recording equipment and the undercover DTF vehicle and gave DTF officers the purchased crack. Id. at ¶157. DTF officers searched CI 1395 and the undercover DTF vehicle for contraband or currency,

with negative results. Id. at ¶158. Officer Hackett returned the currency to CI 1395 that was found on CI 1395's person during the initial pat-down search. Id. at ¶159. DTF officers performed a field test on the purchased crack to confirm its weight and the presence of cocaine base. Id. at ¶160. They itemized all of the expended prerecorded money by serial number. Id. at ¶161. DTF officers placed the crack, all recorded audio and visual material, and all other evidence collected into labeled evidence bags. Id. at ¶162.

Officer Hackett transported all evidence collected in the controlled transaction directly to the DTF, where it was weighed and processed. Id. at ¶163. Officer Hackett packaged and sealed the evidence. Id. at ¶164. He completely and accurately entered the items of evidence collected during the controlled transaction into Evidence Manager. Id. at ¶165. Officer Hackett printed bar code labels from Evidence Manager, and affixed them to the outside of each package of evidence collected during the controlled transaction. Id. at ¶166. Officer Hackett placed each item of evidence collected during the controlled transaction into an evidence locker. Id. at ¶167.

While CI 1395 was returning the recording equipment to Officers Hackett and Shepardson and being searched for contraband, other DTF officers were taking the plaintiff into custody about three blocks from the Pizza Hut parking lot where the transaction had taken place. Id. at ¶168. Jeff Lade was one of the officers involved in the plaintiff's arrest, and he searched the plaintiff on the scene for any evidence, but found nothing. Id. at ¶169. The plaintiff was transported to an interview room at the Green Bay Police Department, and the

20

recording equipment in the room was activated. Id. at ¶170. Officer Hackett

asked the plaintiff for his consent to perform a strip search. Id. at ¶171.

Lieutenant Laux authorized a strip search to be conducted. Id. at ¶172.

Officers Hackett and Lade took the plaintiff to another interview room without

recording equipment and performed a strip search. Id. at ¶173. Under DTF

policy 14, strip searches of suspects in custody are performed

without the use of a recording device, and are performed under conditions that

provide privacy from all but those authorized to conduct the search. Id. at

¶174. During the plaintiff's strip search, Officers Hackett and Lade located

$600 of prerecorded currency in the plaintiff's underwear. Id. at ¶175. Once

back in the original interview room, Officer Hackett interviewed the plaintiff,

and the plaintiff signed a consent form for the search of his residence. Id. at

¶176. DTF officers, including officers Laux, Dernbach, Hackett, Shepardson,

and Lade, subsequently searched plaintiff's residence. Id. at ¶177.

G.    Relevant Policy

The Brown County Sheriff's Department promulgates various Drug Task

Force policies for the DTF to follow during its investigations. Id. at ¶182. DTF

policy "DTF 01" describes generally the duties of the case agent and work flow

requirements for each investigation. Id. at ¶183. In DTF investigation 10-269,

the case agent was Mark Hackett. Id. at ¶184. As the case agent, Officer

Hackett was responsible for preparing the district attorney referral and

ensuring that all required material accompanied the referral. Id. at ¶185. He

was responsible for providing any additional evidence from the investigation to the assistant district attorney as it became available. Id. at ¶186.

On or before January 11, 2011, DTF officers determined they had probable cause to arrest the plaintiff. Id. at ¶194. By January 11, 2011, DTF officers had determined that it was unlikely they would obtain any additional, useful evidence that might lead the DTF to other suspects from further controlled buys involving the plaintiff. Id. at ¶195. Officer Hackett determined that the DTF would arrest plaintiff following the January 11, 2011, transaction. Id. at ¶196.

Officer Hackett referred the charges against plaintiff stemming from investigation 10-0269 to the District Attorney's Office for prosecution on January 13, 2011. Id. at ¶197. As required by DTF policy 03, on January 13, 2011, Officer Hackett provided all required information to the district attorney's office in the referral of plaintiff's charges, including a complete copy of the case and all electronic discovery.[6] Id. at ¶198. Information about confidential informants is not included in DTF investigation files, and therefore is not routinely sent to the district attorney when a case is referred to the district attorney's office. Id. at ¶199. Officer Hackett did not send information about CI 1395 to the district attorney when referring the plaintiff's case to the district attorney's office. Id. at ¶200.

While DTF policies do not require confidential informants to be strip searched, DTF policies do not prohibit DTF officers from strip searching a

---

[6] The plaintiff disputes that Hackett provided all required information to the District Attorney's office. Dkt. No. 246 at ¶198.

22

confidential informant if they have a reasonable belief or suspicion that a confidential informant is hiding contraband on his or her person.[7] Id. at ¶201. At no time during the pendency of investigation 10-0269 did DTF agents Mark Hackett, David Poteat, Guy Shepardson, Zak Holschbach, or Brad Dernbach have any reason to believe or suspect that CI 1395 was hiding contraband on his person such that a strip search would be necessary. Id. at ¶202. CI 1395 was deactivated on September 1, 2011. Id. at ¶203. Pursuant to DTF policy 05, all working files pertaining to CI 1395 were destroyed at the time of his deactivation. Id. at ¶204.

The DTF has a citizen complaint procedure that is explained on the Brown County Sheriff's Department's website. Id. at ¶205. Citizens may lodge a complaint regarding DTF officers, policies, or procedures by requesting a Citizen Complaint form from the Sheriff's Department in person, by telephone, by mail, or online. Id. at ¶206. This complaint procedure has been in existence, and unchanged, since December 2008. Id. at ¶207. Citizen complaints to the DTF must follow the form set forth in the Sheriff's Department's complaint procedure. Id. at ¶208. Any form of complaint or inquiry that does not comply with the Sheriff's Department's complaint procedure is not considered a formal complaint, and is not tracked or maintained by the DTF, the Sheriff's Department, or Brown County. Id. at ¶209. As an exhibit to an affidavit he filed in this case on October 20, 2014, attached at document entitled "Complaint

---

[7] The plaintiff disputes this, and asserts that according to Hackett, the DTF does not strip search confidential informants because strip searches would make it difficult to get people to cooperate with the DTF. Dkt. No. 246 at ¶201.

23

Concerning DTF, deliberate indifference." Dkt. No. 92-9. The document bears a date of October 20, 2011. Id. at 1. The plaintiff's complaint submission did not comply with the Brown County Sheriff's Department's citizen complaint procedure. Dkt. No. 125 at ¶210.

DTF policy 06 requires that confidential informants must be searched before and after each contact the CI has with a suspect. Id. at ¶215.

H.    Defendants Brodbeck and Young

The only date on which Investigator Brad Brodbeck participated in DTF investigation 10-0269 was January 11, 2011. Dkt. No. 228 at ¶218. That day, Brodbeck was part of a group of DTF investigators that surveilled the plaintiff while he purchased cocaine from CI 1395. Id. at ¶219. Brodbeck conducted a consent search of the plaintiff's apartment on behalf of the DTF on January 11, 2011, following the plaintiff's arrest. Id. at ¶220. Only two items of evidentiary value were recovered during the search: a money order receipt from Wal-Mart for $900.00 and a clear plastic baggie with the corner missing. Id. at ¶221.

Mary Lynn Young was not a member of the DTF, and did not participate in any DTF activities related to investigation 10-0269. Id. at ¶223. During the pendency of DTF Investigation 10-0269, Young was the Civil Process Clerk employed by the Brown County Sheriff's Department. Id. at ¶224. Young staffed the reception window in the lobby of the Sheriff's Office. Id. at ¶225. One of her duties was to sign for incoming certified mail deliveries. Id. at ¶226. Young does not specifically recall signing for any certified mail the plaintiff sent to the Brown County Sheriff's Office. Id. at ¶227. She did not open, inventory,

24

or examine the contents of packages or mail for which she signed as civil process clerk. Id. at ¶228. Young was the person who physically received mail, including packages shipped from the state crime lab to the DTF that contained evidence. Id.

I.    Green Bay Defendants' Facts

Defendant City of Green Bay is a municipality organized under the laws of the State of Wisconsin. Dkt. No. 236 at ¶1. Defendant John C. Laux is a police captain employed by the City of Green Bay Police Department. Id. at ¶2. Laux served as a supervisor of the DTF from September 2009 to December 2011. Id. at ¶3. Laux did not create policies for the DTF. Id. at ¶4. The DTF operated under the policies of the DTF, not the policies of the Green Bay Police Department. Id. at ¶5.

While a supervisor of the DTF, Laux did not determine what evidence would be seized or the value of seized evidence. Id. at ¶8. Laux never edited/altered video or audio recordings, did not take statements from anyone, did not operate video cameras, did not interview confidential informants, did not decide what was to be seized as evidence, and did not decide what evidence the district attorney reviewed or was used as evidence in the prosecution at trial. Id. at ¶¶9-14. The DTF did not maintain "unofficial files." Id. ¶17.

Defendant Scanlan served as an investigator of the DTF from August 2010 until August 2014. Id. at ¶20. As a DTF investigator, he did not create DTF policies. Id. at ¶21. Scanlan collected and logged evidence. Id. at ¶23.

## III. ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

26

B.      The Plaintiff's Claims

The plaintiff filed four complaints. He framed his claims somewhat differently in each version. Because the June 19, 2015 fourth amended complaint is the operative complaint, the court will frame the plaintiff's claims the way he framed them in that complaint.

The first of the plaintiff's four claims alleged that Brown County, the DTF and "participating municipalities" had an "unconstitutional custom, policy, and/or practice regarding citizen complaints . . . that denie[d] citizens good faith participation in any complaint procedure relief." Dkt. No. 184 at 10. Specifically, he alleged that he wrote a complaint alleging that "in-part false evidence" had been used against him, but that no one responded to the complaint. Id. at 9. The plaintiff alleged that defendants Brown County, the DTF and Poteat (the director of the DTF) violated "due process"—presumably under the Fourteenth Amendment—and Wis. Stat. §66.0511(3) with their policy or practice. Id. at 9-10.

Second, the plaintiff alleged that someone—he names only defendants Hackett (the case agent from Brown County) and Jones (the confidential informant) in this claim—violated due process by having an "unconstitutional police record keeping system." Id.

Third, the plaintiff alleged that a number of the defendants—Poteat, Laux, Lade, Hackett, Hoschbach, Dernbach, Shepardson, Scanlan, Brodbeck, Jones, Brown County, the DTF, the Village of Ashwaubenon and the City of

27

Green Bay—either fabricated evidence to use against him, or assisted in the fabrication of evidence. Id. at 11-15.

Finally, the plaintiff alleged that Brown County, the DTF and "participating municipalities" did not have a policy of strip-searching confidential informants before using them to conduct controlled buys, and that their failure to have such a policy violated due process. Id. at 16-18.

A year later, in his June 1, 2016 brief opposing the defendants' motions for summary judgment, the plaintiff laid out his claims in a different way. Dkt. No. 249 at 1. In that pleading, the plaintiff characterized his four claims as follows:

> 1. Plaintiff claims that the Defendants utilized an unconstitutional police Record keeping and Disclosure/Case Flow custom and/or practice. Plaintiff asserts that the process provided by the Brown County Drug Task Force (DTF) policies for Record keeping and Disclosure/Case Flow to the Brown County District Attorney (BCDA) was adequate "in theory" but unconstitutional in practice. Plaintiff argues that the County, City and Village defendants utilized an unconstitutional practice by not following their own policies and as a result denied plaintiff liberty interest protected by procedural due process.
>
> 2. Plaintiff claims the Defendants fabricated video recordings that were not essential to his February 2, 2012, conviction in Brown County Circuit Court Case (BCCCC) 11-CF-43 as the video recordings were not essential to the prosecutor's case. Plaintiff's claim focuses on the Defendants' usage of the wrong procedures and not any reaching of the wrong result/outcome of plaintiff's trial. Plaintiff's fabrication of evidence claims is established by the protected liberty interest rooted in both constitutional laws and the Defendants' own policies protected by procedural due process.
>
> 3. Plaintiff claims that the Defendants utilized an unconstitutional citizen complaint policy that did not allow him (an incarcerated person at all times relevant to take good faith participation in it). Plaintiff here relies on the provision of Wis. State Statute 66.0511(3) that mandates each person in charge of a

28

law enforcement agency shall prepare in writing and make available to the public a specific procedure for processing and resolving a complaint by "any person" regarding the conduct of a law enforcement agent. Plaintiff argues that the Defendants provided inadequate process by not making the complaint process available to incarcerated persons in the Brown County Jail (BCJ).

4. Plaintiff claims that the defendants utilized an unconstitutional policy not to strip search confidential informants. The outlined policy denied suspects' corroboration by DTF agents specifically in circumstances where indicia was present that the CI is unreliable and/or compromised. Plaintiff agrees that the DTF strip policy was adequate "in theory" as it relates to CI's, but at all times relevant it was inadequate in practice. The Defendants provided inadequate process/practice for violating their own policies and as a result denied liberty interest protected by procedural due process.

Dkt. No. 249 at 1-2.

    C.    <u>Analysis of the Plaintiff's Claims</u>

        1.    The court will accept, for the purposes of this decision, the plaintiff's assertions that he is not trying to attack the validity of his criminal conviction.

In <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994), the Supreme Court held that a plaintiff cannot use a §1983 suit to attack the validity of his criminal conviction. The court held that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence . . . ." <u>Id.</u> at 487. If a judgment in the plaintiff's favor would imply that his conviction or sentence was invalid, "the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." <u>Id.</u> <u>See also</u>, McCann v. Neilsen, 466 F.3d 619, 620-21 (7th Cir. 2006) (citing <u>Heck</u>, 512 U.S. at 487). To the extent that the plaintiff

29

claims that the defendants withheld exculpatory evidence (dkt. no. 184 at 5), this claim is Heck-barred. See id.

The plaintiff, responding to the defendants' argument that Heck bars most, if not all, of the plaintiff's claims, argues repeatedly that he is not challenging the validity of his conviction. He says that the defendants' arguments in this regard "border[] on the ridiculous." Dkt. No. 249 at 31. He says that his claims focus only on the defendants' failure to follow their own policies. Id. In many places in his response to the Brown County defendants' summary judgment brief, the plaintiff states that "the only focus here is not on trial error," but whether the defendants "conducted [their] operations within the boundaries of [their] own policies." Id. at 17. He concludes by arguing that if he prevails in this lawsuit, "[the plaintiff] will not be released from prison nor will his sentence be shortened. If he is successful, such a disposition at most he would have the opportunity to use the outlined documents in future proceedings." Id. at 32.

The Supreme Court stated in Skinner v. Switzer, 562 U.S. 521, 534 (2011) that it never had issued a decision limiting an aggrieved party to the criminal or *habeas corpus* process "where the relief sought would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody.'" (Citation omitted.) The Court made this observation in a situation in which the state had argued that, although what the plaintiff sought in that §1983 case was the right to have a DNA test, the state believed that the plaintiff's "*ultimate* aim . . . [was] to use the test results

30

as a platform for attacking his conviction." Id. The Court rejected that "ultimate aim" argument, and found that the plaintiff's efforts to get a DNA test were not Heck-barred.

It is understandable that the defendants in this case see that same "ultimate aim" possibility. Prosecutors have a constitutional obligation to turn over to a criminal defendant certain evidence prior to trial; if they fail to do so, the conviction may be rendered invalid. See, e.g., Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972). If law enforcement officers engage in misconduct during an investigation or a prosecution—if, for example, they fail to give the prosecutor the evidence which the prosecutor is required to turn over to the defendant—the defendant in the criminal case may raise that failure to disclose in a motion to suppress. Such a motion could result in the court excluding the evidence at trial—which could result in the jury acquitting the defendant on some or all of the charges. When the plaintiff says that if he's successful in this case, he'll obtain nothing but the "opportunity to use the outlined documents in future proceedings," it is difficult to imagine what those future proceedings might be, if not an attack on the validity of his criminal conviction.

Nonetheless, for the purposes of summary judgment, the court will accept the plaintiff's assertion that, in filing this lawsuit, he is—in effect—doing a public service, rather than seeking to challenge his conviction. The plaintiff states that he is "us[ing] his own criminal case to expose[] flawed practices by the` DTF" and the other defendants. Dkt. No. 249 at 33. He indicates that he is

31

trying to "reveal[]" through this case "customs, policies and practices" that would not have been revealed had the defendants not investigated him. Id. at 3. The court will accept those assertions—but as a result of accepting those assertions, the court also concludes that the plaintiff has presented no claims which can survive summary judgment.

2. The plaintiff has not raised a genuine dispute of material fact as to whether the defendants violated his rights under the Fourteenth Amendment.

As noted above, the plaintiff alleged in his fourth amended complaint that the defendants' failure to follow policies, or to implement policies, violated "due process." Although he does not mention any constitutional provision in the fourth amended complaint, his prior complaints grounded his claims in the Fifth and Fourteenth Amendments to the Constitution. Both amendments prohibit the deprivation of life, liberty or property without due process of law. The plaintiff has not alleged that the defendants' actions deprived him of life or property. Rather, he argues that the defendants deprived him of certain liberty interests. He does not claim that the defendants deprived him of physical liberty—he makes repeated assertions that he is not challenging his arrest, conviction or sentencing. Rather, he argues that he had a liberty interest in being able to rely on the defendants to follow their own policies, or to create policies. The court, therefore, will analyze his claims under the Fourteenth Amendment due process clause. See generally, Oberfell v. Hodges, ___ U.S. ___, 135 S. Ct. 2584, 2632-2638 (2015) (Scalia, J., dissenting) (arguing that the "liberty" protected by the Fifth Amendment is liberty from physical restraint,

and asserting that the Court has gone too far in interpreting the "liberty" protected under the Fourteenth Amendment more broadly).

The Fourteenth Amendment prohibits the government from depriving a person of liberty or property without due process. For a plaintiff in a §1983 case to prevail on a Fourteenth Amendment due process claim, then, the plaintiff must show that the defendants' actions deprived him of either a liberty interest or a property interest.

As discussed above, the plaintiff has asserted several times that he is not challenging his conviction or his sentence. He has avoided arguing that he should not have been arrested, or should not have been taken into custody, or should not have been sentenced. The court finds that the plaintiff has not presented evidence or argument that the defendants deprived him of his physical liberty without due process.

a.    *Alleged failure to follow DTF record-keeping policy*

The plaintiff asserts that his "protected liberty interest lies in his ability as a United States Citizen to rely on the Defendants' policies without question. . . ." Dkt. No. 249 at 6. He states that the defendants' practices denied him his "liberty interest in his ability to rely on DTF policy as it relates to record keeping and disclosure/case flow." Id. at 12. He states that "DTF does not adhere to its own policy," which "den[ies] liberty interest to rely on DTF policy which is protected by procedural due process." Id. at 14. He later puts it another way in relation to his argument that certain defendants fabricated evidence, asserting that some of the defendants "both knowingly and un-

33

knowingly infringed on his . . . liberty to place full reliability in/on DTF's promulgated (DTF 01) Record keeping amounts to fabrication evidence." Id. at 21.

There are two flaws with these arguments. The first is that neither the plaintiff nor anyone else has an unqualified Fourteenth Amendment right to rely on law enforcement policies. The Supreme Court stated years ago that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim v. Wakinekona, 461 U.S. 283, 250 (1983). For this reason, the Seventh Circuit has held repeatedly that "[a] state's failure to follow its own procedures does not violate the due process clause." Scott v. Vill. of Kewaskum, 786 F.2d 338, 342 (7th Cir. 1986). See also, e.g., Dietchweiler by Dietchweiler v. Lucas, 827 F.3d 622, 628 (7th Cir. 2016); Kvapil v. Chippewa Cnty, Wis., 752 F.3d 708, 715 (7th Cir. 2014); Charleston v. Bd. Of Tr. of Univ. of Ill., 741 F.3d 769, 773 (7th Cir. 2013); Pro-Eco, Inc. v. Bd. of Comm'rs of Jay Cnty, Ind., 57 F.3d 505, 514 (7th Cir. 1995). The plaintiff bases all of his Fourteenth Amendment claims on the argument that he had a due process right to rely on the defendants to follow their own procedures. He did not.

The second flaw with these arguments is that, even if the plaintiff had a constitutional right to rely on the defendants to follow their own policies, he has not demonstrated that they did not do so.

The plaintiff asserts that the defendants failed to turn over to the district attorney (and thus, apparently, that the district attorney did not turn over to

him or his counsel) "unofficial files"—certain operational plans, confidential informant information, "working files," and some kinds of electronic recordings. Dkt. No. 249 at 4. The evidence does not support that contention. The case agent assigned to the plaintiff's case, Mark Hackett, submitted an affidavit (evidence), attesting to the facts that he did not withhold any evidence from the DA's office in the plaintiff's case (dkt. no. 132 at ¶93); that Exhibit II to the affidavit (dkt. no. 132-35) was a true and correct copy of everything he *did* forward to the DA in the plaintiff's case (dkt. no. 132 at ¶95); and that those materials constituted the entire contents of the investigative file in the plaintiff's case (dkt. no. 132 at ¶96). In contrast, the plaintiff has not presented any evidence that there was an "unofficial" file in his case that didn't get turned over to the DA.

Even if, however, the DTF *had* had a file that contained operational plans for the investigation of the plaintiff, confidential informant information, working files and some electronic recordings, and even if the DTO *hadn't* turned that file over to the DA, that failure would have violated the plaintiff's constitutional rights only if he could show that he was injured by that failure. Because the plaintiff has no liberty interest in relying on the DTF policies, the only injury the plaintiff could have alleged was that the failure to turn over the "unofficial" file invalidated his conviction, or his sentence. If the plaintiff had alleged *that* injury, he would find himself confronted with the Heck bar—the place for the plaintiff to address such an injury was in his criminal case, either through a motion to suppress or on appeal.

35

b.  *Alleged fabrication of evidence*

Similarly, the plaintiff contends that the defendants fabricated evidence. He argues that during his trial, Ashwaubenon defendant Jeff Lade testified under oath that Lade "recorded video surveillance recordings during the outlined controlled transaction." Dkt. No. 249 at 16. In addition, he alleges that Jones (the confidential informant) testified that he recorded video surveillance during the October 29, 2010 transaction. Id. The plaintiff appears to acknowledge that the property reports for the controlled buys shows that these videos existed. Id. He argues, however, that the operational plan prepared for the October 29 controlled buy provides for different officers—Brodbeck and Scanlan—to do the video surveillance, and that there are no recordings from those two agents (and none from them sent to the DA). Id. at 17. The plaintiff's brief goes into great detail about all of the reasons that the fact that the operational plan doesn't match up with the testimony given by these and other defendants proves that they fabricated evidence. Id. at 17-26.

Operational plans are just that—*plans.* They outline what the DTF plans to do at a particular point in time. Dkt. No. 250 at 11. They do not mandate what will happen—they can't, because things change. Officers get sick, or have to be off work, or get reassigned. Suspects don't show up, or show up somewhere unexpected. Recording equipment fails. Informants have to change plans as the situation on the ground changes. Any of these things—and a hundred more—can result in plans changing. As the poet Robert Burns wrote,

36

"The best-laid schemes o' Mice an' Men, Gang aft agley"[8]—meaning, the best-laid plans often go awry.

More to the point, the plaintiff again has failed to provide any evidence to support his claims that the defendants fabricated anything. And, if the plaintiff *had* submitted admissible evidence demonstrating that the defendants had fabricated evidence, the plaintiff cannot allege that he was injured by such fabrication. The only injury he could allege would be that the allegedly fabricated evidence resulted in an invalid conviction or sentence, and again, he cannot challenge his conviction or sentence via a §1983 suit.

In attempting to avoid the mandate of Heck, the plaintiff appears to argue that the plaintiffs fabricated evidence, but that the fact that they did so was not exculpatory. If that is, indeed, his argument, it must fail for another reason. A §1983 plaintiff cannot bring a constitutional challenge to a state action if he has a remedy for that action under state law. McCann v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003). Under Wisconsin law, the plaintiff could bring a claim that the defendants manufactured evidence, which they transmitted to the DA in support of their request that he be prosecuted on drug charges; that would be a claim for malicious prosecution. See id. (citing Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001)); see also Saunders-El v. Rohde, 778 F.3d 556, 560 (7th Cir. 2015). Wisconsin recognizes the tort of malicious prosecution. See, e.g., Segall v. Hurwitz, 114 Wis. 2d 471, 488 (Ct. App. 1983); Turner v. Sanoski, 327 Wis. 2d 503, 509 (Ct. App. 2010).

[8] "To a Mouse, On Turning Her Up In Her Nest With the Plough," by Robert Burns.

c.    *Failure to create a policy requiring the strip-search of confidential informants*

In his original complaint, the plaintiff alleged that Poteat, Hackett, and Shepardson violated his Fourteenth Amendment rights by failing to strip-search informants before they participated in controlled buys, and by failing to establish a policy to conduct such strip searches. Dkt. No. 1 at 25-26. While it is difficult to be sure, it appears that his amended complaint made the same allegations against Hackett and Shepardson. Dkt. No. 7 at 11. His second amended complaint did not cite to a constitutional provision, but alleged that the DTF failed to implement a policy requiring that confidential informants be strip-searched; the caption to this claim reads, "Denial of Due Process Unconstitutional DTF No Strip Search of 'CI' Policy." Dkt. No. 21 at 17-19. The third amended complaint alleges that DTF should have created the policy. Dkt. No. 36 at 19. The fourth amended complaint appears to direct this claim to Brown County, the DTF and "participating municipalities." Dkt. No. 184 at 17.

The plaintiff's claim cannot survive summary judgment, regardless of which defendants he intended to include in it. In contrast to his argument that the defendants violated the Fourteenth Amendment by failing to follow their policies, the plaintiff argues here that the defendants violated the Fourteenth Amendment by failing to *establish* a policy—in this case, a policy requiring DTF officers to strip-search informants before allowing them to participate in controlled buys. Presumably, the concern the plaintiff believes such a policy would address is the concern that an informant might "plant" drugs on an innocent person, or might bring drugs to the transaction himself but then lie to

38

law enforcement, telling the officers that the innocent person had provided the drugs. This concern is similar to a concern that law enforcement—or an informant—might fabricate evidence against an innocent party. The Seventh Circuit has held that, under some circumstances, a claim of evidence fabrication can violate a defendant's due process rights. Saunders-El v. Rohde, 778 F.3d 556, 560 (7th Cir. 2015).

But just as the plaintiff does not have a Fourteenth Amendment right to rely on the defendants to always follow their own policies, he does not have a Fourteenth Amendment right to have the defendants create policies, or even to engage in "best practices." The plaintiff argued in his fourth amended complaint that other municipalities had policies requiring officers to strip-search informants. Dkt. No. 184 at 16. The fact that other municipalities strip search confidential informants does not mean that the *Constitution* requires that procedure. The Supreme Court has stated that "[i]n defining the process necessary to ensure 'fundamental fairness' we have recognized that the [due process] Clause does not require that 'the procedures used to guard against an erroneous deprivation . . . be so comprehensive as to preclude any possibility of error." Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 320 (1985) (citation omitted). The Court also "emphasized that the marginal gains from affording an additional procedural safeguard often may be outweighed by the societal cost of providing such a safeguard." Id. at 320-321 (citation omitted).

In this case, DTF officers did follow their policy for preventing informants from fabricating evidence. Following DTF 06, "Procedures" §5(c) ("An informant

that will be used in undercover operations to purchase evidence shall be searched before and after each contact with the suspect"), dkt. no. 133-5 at 3, officers pat-searched CI 1395 before and after each transaction. At no time during the pendency of investigation #10-0269 did DTF officers have any reason to believe or suspect that CI 1395 was hiding contraband on his person such that a strip search would be necessary. If they had, DTF policies would not have prevented them from strip-searching him. The plaintiff has not produced evidence demonstrating that CI 1395 fabricated evidence, or that a strip-search policy would have revealed that CI 1395 fabricated evidence. The plaintiff's belief that a strip-search policy would be a "best practice" for preventing evidence fabrication does not support his claim that the lack of such a policy violated his Fourteenth Amendment rights.

d.   *Alleged failure to follow citizen complaint procedure*

In his fourth amended complaint, the plaintiff alleged that Brown County, DTF, "participating municipalities," and Poteat violated Wis. Stat. §66.0511(3)[9], and thus denied him due process. Dkt. No. 184 at 10. Wis. Stat. §66.0511(3) requires "each person in charge of a law enforcement agency" to prepare a written procedure "for processing and resolving a complaint by any person regarding the conduct of a law enforcement officer employed by the agency," and to make that written policy available to the public. The plaintiff alleges that the defendants denied citizens the ability to participate in the

---

[9] That statute was repealed in part and renumbered by 1999 Act 150 §§151 to 153, eff. Jan 1, 2001.

complaint procedure, because he wrote a complaint and never received a response. Id.

The plaintiff's claim regarding the complaint procedure is based on the same theory as his claim about the defendants' record-keeping procedures: a claim that the defendants failed to follow their own policies. Defendant Poteat provided evidence, in the form of a screen-shot of a page from the Brown County Sheriff's Department web site, that the Brown County Sheriff's Department has a written citizen complaint procedure of the kind mandated by Wis. Stat. §66.0511(3). Dkt. No. 133-7. There is no genuine dispute regarding the material fact that Brown County had such a procedure; thus, there is no genuine dispute regarding whether the Brown County Sheriff's Department violated state law. It did not.

The plaintiff alleges that he first enquired about how to make a citizen complaint on October 19, 2011, while he was incarcerated at the Brown County Jail. Dkt. No. 184 at 9. He says that the jail staff did not know how people could make citizen complaints, but suggested that he contact a lieutenant and a captain at the sheriff's department. Id. The next day, the plaintiff wrote a complaint and sent it to the lieutenant and the captain by certified mail. Id.; dkt. no. 22 at 18 (copy of complaint); dkt. no. 22 at 21 (certified mail receipts). He alleges that he never received a response, dkt. no. 184 at 10, and that the fact that he didn't receive a response violated his due process rights.

41

The plaintiff is correct that Wisconsin law required the Brown County Sheriff's Department to have a written complaint process. But he has provided no evidence that the department violated that law, and defendant Poteat has provided evidence that the department complied with the law. The plaintiff's actual argument is that the department did not follow its own complaint procedure, because it did not respond to the complaint he filed. This argument, like his others, has no merit.

As with his previous claims, the plaintiff has provided no evidence that the defendants did not comply with their own citizen complaint procedure. The procedure gives a citizen several ways to make a complaint: calling one of two telephone numbers; visiting the sheriff's department and telling the person at the front desk the citizen wants to file a complaint; asking for a citizen complaint form; and obtaining the complaint form from the web site. Dkt. No. 133-7 at 1. Regardless of which method the citizen chooses, the procedure informs citizens that they must "complete and have notarized the Affidavit form which is the last part of the complaint." Id.

Although the plaintiff did have someone notarize the document he created, which he captioned "Complaint Concerning DTF, deliberate indifference," dkt. no. 22 at 18, 20, the plaintiff did not complete, or have notarized, the required affidavit form. The defendants state that if a complaint doesn't follow the required form, the Sheriff's Department does not consider it a formal complaint, and does not "track[] or maintain[]" it. Dkt. No. 125 at 29, ¶¶209-210.

42

One could argue that the plaintiff *couldn't* follow the citizen complaint procedures, because he didn't know what they were. He was in jail and couldn't access the web site. When he asked jail staff about the procedure, they did not know it, either, but suggested that he contact two members of the sheriff's department staff. The plaintiff did what the jail staff suggested, so one could argue that the plaintiff did the best he could in a circumstance in which he did not know, and did not have access to, the proper procedure.

Even if the court assumes that the sheriff's department should have accepted the plaintiff's complaint under these circumstances, he has not demonstrated that the sheriff's department violated the complaint procedure by failing to respond to him. The procedure does not require the department to provide a complaining citizen with a response. The web site explains that less severe complaints may be handled by the offending employee's supervisor, while more severe complaints will be "referred to the Professional Standards Division of the department for investigation." Dkt. No. 133-7. It also explains that in the case of an investigation, a "final report" is submitted (it does not say to whom) once the investigation is over, and the "Chief Deputy will review for completeness." Id. If the chief deputy thinks it is appropriate, he or she will "recommend corrective measures such as directing the employee's future actions, training, and/or discipline." Then, the investigation goes to the sheriff "for final review and approval." Id. While the complaint procedure describes the actions that the sheriff's department may take about an employee who is the

43

subject of a citizen complaint, it does not provide the complaining citizen with any right to a response.

The evidence the defendants have submitted shows that the defendants *did* have the statutorily-required complaint procedure. It shows that the *plaintiff*, not the defendants, failed to follow that procedure. And the plaintiff has provided no evidence that the procedure entitled him to receive a response to the complaint he sent.

Finally, the court already has discussed the fact that the plaintiff does not have a Fourteenth Amendment right to rely on the defendants adhering to their policies. Even if the court could find that the sheriff's department should have accepted his complaint, and even if the citizen complaint procedure had required the sheriff's department to respond to the plaintiff with regard to his complaint, he does not have a Fourteenth Amendment due process right to rely on the defendants to follow that procedure.

e.    *Standing*

Given the plaintiff's repeated claims that he is not alleging that the defendants' actions injured him by causing him to be wrongfully convicted or sentenced, there is some question as to whether the plaintiff has standing to bring any of the above claims. A person who asks a federal court for relief must show that he has "standing" under Article III of the Constitution—in other words, that there is a actual "case or controversy" for the court to decide. Sanner v. Bd. of Trade of City of Chicago, 62 F.3d 918, 922 (7th Cir. 1995) (citation omitted). The Supreme Court has held that this "irreducible

44

constitutional minimum of standing" has three components. First, the plaintiff "must have suffered 'an injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" <u>Lujan v. Defenders of Wildlife</u>, 504` U.S. 555, 560 (1992) (citations omitted). Second, the plaintiff must be able to show a "causal connection between the injury and the conduct complained of . . . ." <u>Id.</u> (citations omitted). Third, there must be a likelihood that the court could address the injury with a decision in the plaintiff's favor. <u>Id.</u> (citation omitted).

Over the course of the plaintiff's pleadings, he argues a number of times that the defendants violated *his* rights by failing to follow policies, or by failing to enact them. The court has found above that the plaintiff does not have a constitutional right to rely on the defendants to follow certain policies, and that he does not have a constitutional right to have them create policies. Because he has no such right—no "legally protected interest" which the defendants invaded—there is a question about whether the plaintiff has asserted that he suffered a concrete, particularized injury.

The plaintiff also implies that the defendants' alleged failure to follow policies, or to create them, has—or could—injure others. He asserts that he raises these claims, not to contest his conviction, but to use his criminal case to demonstrate the defendants' failings. This implies that he is making his claims in an attempt to prevent future injuries to others. It is "substantially more difficult" for a plaintiff to establish standing when he "himself" is not "the object of the government action or inaction." <u>Lujan</u>, 504 U.S. at 562 (quoting

Allen v. Wright, 468 U.S. 737, 758 (1984)). The plaintiff's implication that he is pointing out the defendants' failures for the common **weal** is not sufficient to give him standing to sue on behalf of others. He has not alleged that he has any authority to act on behalf of anyone else.

Because standing is a requirement of federal court jurisdiction, the court normally would begin its analysis by determining whether the plaintiff had standing; if it concluded that he did not have standing, the court would dismiss the case for lack of jurisdiction without analyzing the merits of the plaintiff's claims. The court has not proceeded in that fashion in this case, because portions of the plaintiff's pleadings belie his protestations that he is not seeking to attack his conviction or his sentence. If the plaintiff truly means it when he says that the defendants' failures did not result in a wrongful conviction or sentence, it is not clear that he has standing. If he does not mean it, he may have standing, but his claims are <u>Heck</u>-barred.

> 3. The court does not need to reach the question of whether the defendants are entitled to qualified immunity.

The defendants argued in their original joint brief that "to the extent that any of plaintiff's claims could be read as an allegation that the defendants did not have probable cause to arrest him, the defendants are entitled to immunity." Dkt. No. 124 at 28. The plaintiff has not asserted that the defendants did not have probable cause to arrest him; if he had, that claim would have been <u>Heck</u>-barred. The court, therefore, does not need to analyze whether the defendants would have been entitled to immunity if he had made that argument.

46

4. Defendant Jujuan Jones

Defendant Jujuan Jones is CI 1395. The plaintiff named Jones as a defendant in his original, May 30, 2013 complaint (dkt. no. 1); in his June 13, 2013 first amended complaint (dkt. no. 7); in his January 10, 2014 second amended complaint (dkt. no. 21); in his April 25, 2014 third amended complaint (dkt. no. 36); and in his June 19, 2015 fourth amended complaint (dkt. no. 184). He did not name Jones in the January 10, 2014 amended complaint (dkt. no. 21). None of the complaints specifically state what the plaintiff believes that Jones did to violate his constitutional rights, although he says in the June 19, 2015 fourth amended complaint that the actions of various defendants (including Jones) "by fabricating digital evidence in effort to obtain a conviction" violated his due process rights. Dkt. No. 184 at 19.

On June 29, 2015, the U.S. Marshals service served the plaintiff's complaint (it is not clear which version; likely the June 19, 2015 fourth amended version) on someone named Keyvonia Pope, at 4854 North 47th Street in Milwaukee. Dkt No. 210. The court does not know whether this was Jones' residence, or whether the person the marshals served was related in any way to Jones. It may be that Jones never has received the plaintiff's complaint, and is not aware that the plaintiff has sued him.

To the extent that the plaintiff meant to include Jones in his claim that the defendants fabricated evidence (Dkt. No. 184 at 19), the court has found that that claim has no merit. Thus, despite the fact that Jones has not

answered the complaint, and might not even be aware that the plaintiff has sued him, the court will dismiss Jones along with the other defendants.

## IV.    CONCLUSION

The court **GRANTS** the Brown County defendants' amended motion for summary judgment. Dkt. No. 226.

The court **GRANTS** the City of Green Bay defendants' renewed motion for summary judgment. Dkt. No. 235.

The court **GRANTS** the Village of Ashwaubenon amended motion for summary judgment. Dkt. No. 233/226.

The court **DISMISSES** defendant Jujuan Jones.

Dated in Milwaukee, Wisconsin this 13th day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge

48